Matthew C. Helland, CA Bar No. 250451
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

James H. Kaster, CA Bar No. 248949
Lucas J. Kaster, CA Bar No. 291102*
NICHOLS KASTER, PLLP
4600 IDS CENTER
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
kaster@nka.com
lkaster@nka.com
*pro hac vice application forthcoming

**Attorneys for Plaintiff**

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| John Ingram,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>Union Pacific Railroad Co.,<br><br>　　　　　　　Defendant. | **Case No. _____**<br><br>**COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**<br><br>**(1)　Disability Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended;**<br>**(2)　Unlawful Screening in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended.** |

Plaintiff John Ingram ("Ingram") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages and other legal and equitable relief resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 et seq., as amended ("ADA").

## PRELIMINARY STATEMENT

1. Beginning in 2014, Union Pacific began implementing company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions – even when the condition had no impact on the employee's ability to safely perform their job. Union Pacific also imposed a policy that automatically removed the employees who disclosed these conditions from service, and subjected the employees to a Fitness-for-Duty evaluation, regardless of whether the employee had been safely performing the essential functions of their job. These evaluations do not assess whether an employee is physically capable of performing their job, and Union Pacific does not conduct physical examinations as a matter of course. In addition, Union Pacific routinely disregards the opinions of the employee's treating physicians. Instead, Union Pacific demands medical information from the employee and conducts a "file review," relying on this review to determine that the employee is unfit for duty, or that the employee requires work restrictions that Union Pacific then refuse to accommodate.

2. In February 2016, several Union Pacific employees commenced a class action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The district court certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

-2-
COMPLAINT FOR DAMAGES

3. Ingram is a victim of the same discriminatory Fitness-for-Duty policies and practices as alleged in *Harris*. Despite being qualified for his job, and having safely performed in his job with the medical condition at issue, Union Pacific removed him from service and subjected him to a Fitness-for-Duty evaluation. He was then excluded from working at Union Pacific because of his condition. Ingram was a putative class member in *Harris*, and timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2). The acts complained of occurred in this judicial district and gave rise to the claims alleged. Moreover, Defendant operates trains in the transportation of freight in the state of California, and at all relevant times engaged in business in this District.

6. Ingram has satisfied all preconditions to suit.

## THE PARTIES

7. Ingram resides in the Upland, California. He was an employee of Union Pacific.

8. Union Pacific is a railroad carrier engaged in interstate commerce. It is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

*UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as **Exhibit A**), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The medical rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical

positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific label "Reportable Health Events":

**A. Cardiovascular Conditions including:**
1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).
2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.
3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.
4. Stroke or Transient Ischemic Attack (TIA).
5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral).
6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty, or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**
1. A seizure of any kind.
2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).
3. Treatment with anti-seizure medication to prevent seizures.
4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**
1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).

    2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).

    3. Significant hearing loss or surgery on the inner ear.

    4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

    1. Including Type I and Type II Diabetes Mellitus if insulin is used.

    2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

    1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

(**Exhibit A**.)

11. Employees who disclose one of these health conditions are required by the Medical Rules to undergo a Fitness-for-Duty evaluation, regardless of whether the condition or treatment affects their ability to perform their jobs. (**Exhibit A**.)

12. Specifically, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(**Exhibit A**.)

-5-
COMPLAINT FOR DAMAGES

13. Under the Medical Rules, Fitness-for-Duty evaluations are automatic for an employee who transfers "from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective bargaining agreement . . . (a) [t]o a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position – agreement and nonagreement), and/or (b) [t]o a position requiring regulatory certification, and/or (c) [t]o other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job." (**Exhibit A**.)

14. These Fitness-for-Duty evaluations are not individualized assessments of the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not physically examine the employee, and routinely disregards the opinions of the employee's treating doctor who *has* physically examined the employee.

16. Once Union Pacific receives the medical information, Union Pacific's HMS Department, located in Omaha, Nebraska and at the time headed by Chief Medical Officer Dr. John Holland, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty

17. Union Pacific's HMS Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employee's ability to safely perform the essential functions of their jobs.

18. When issuing these Fitness-for-Duty determinations, the HMS department relies on standardized protocols for employees with certain health conditions or treatments.

19. For example, the HMS Department labels employees with a broad

range of health conditions as "sudden incapacitation" risks and issues them standard work restrictions that prohibit the employees from: (1) operating company vehicles; (2) working on or near moving trains; (3) operating cranes, hoists, or machinery; and (4) working at unprotected heights over four feet above the ground.

20. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay of work without pay, and many have lost their livelihoods.

## *PLAINTIFF JOHN INGRAM*

21. Ingram was hired by Union Pacific in California in or about January 2012. He worked for Union Pacific as a Senior Electronic Technician until approximately July 2014, when he was removed from his job and never permitted to return.

22. As an Electronic Technician, Ingram was responsible for servicing and maintaining the radio, phone and other communications equipment used by the railroad. Ingram never set foot on a train or had any responsibilities that required him to drive or operate on the railroad tracks.

23. In or around June 2015, Ingram was diagnosed with an intracranial meningioma, also known as a brain tumor. Prior to his diagnosis, Ingram had no medical concerns that impacted his ability to perform his duties and responsibilities.

24. Immediately after his diagnosis, Ingram notified Defendant of his medical status. Ingram told Defendant that he needed immediate surgery to remove the tumor and would be out of work until he recovered.

25. Shortly thereafter, Ingram had surgery to remove the tumor.

26. In or around August 2015, Ingram was cleared to return to work by his doctors. Ingram notified Defendant and provided all the necessary medical documents demonstrating that he was cleared without restriction.

27. On or around September 14, 2015, one day before Ingram was due back to work, he received a call from Bridgette Ziemer, a nurse in Defendant's Health and Medical Services ("HMS") department. Ms. Ziemer informed Ingram that he would not be allowed to return to work due to alleged medical restrictions and his department was unable to accommodate the alleged restrictions.

28. Following his removal from service, Ingram visited his treating physicians for further examination. Ingram's treating physicians cleared him to perform his normal job responsibilities. Ingram provided this documentation to Defendant and its medical department.

29. Still, however, Defendant refused to allow Ingram to return to work.

30. While out, Ingram spoke with several members of Defendant's medical department, urging them to allow him back to work and requesting other positions if Defendant refused to allow to go back to his previous position. Ingram even applied for other positions with Defendant. Each time, Defendant refused Ingram's applications.

31. In January 2016, Dr. John P. Holland, Defendant's Chief Medical Officer, contacted Ingram and notified him that his work restrictions were permanent, and Ingram would not be allowed to return to his position.

32. Defendant's doctors made these determinations without ever seeing Ingram in person.

33. Upon information and belief, no one at Union Pacific spoke to Ingram's doctors in 2015.

34. Ingram challenged Defendant's decision through the union grievance process and an arbitration was held in December 2017.

35. The arbitrator ruled in Ingram's favor and ordered Defendant to return to work if Ingram was cleared by doctors. Ingram provided the medical documentation from his doctors clearing him to return to work and completed a

physical examination with a workers' compensation doctor selected by Defendant. The workers compensation doctor also cleared Ingram to return to work.

36. Still, however, Defendant refused to allow Ingram to return to work.

37. In or around April 2018, Ingram received a phone call from Dr. John Holland and Mary Gallardo, also from Defendant's HMS department. Dr. Holland and Ms. Gallardo informed Ingram that "due to scientific evidence," Defendant would not allow him to return to work. Ingram questioned them about his ability to perform any other position within the company, but Dr. Holland responded that these were the company's findings and "they would not change."

38. Since his surgery in July 2015, Ingram has had no medical issues related to his previous tumor.

39. At all times since his release to work in September 2015, Ingram has been capable of performing the essential functions of his job, and he remains able to perform them today.

40. After being removed from service in 2015, Ingram filed a Charge of Discrimination with the EEOC. The EEOC issued a determination on September 26, 2017.

41. On February 19, 2016, counsel for Ingram, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discriminating in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.)

42. Because he was a putative class member in the *Harris* case, Ingram's claims under the ADA had been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

43. The class action was certified in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

44. As a result of *Crown Cork* tolling, Ingram had ninety (90) days from the date of the Eighth Circuit's order to file a lawsuit. Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Ingram's and other putative class members' claims by an additional sixty (60) days. Therefore, Ingram has until August 21, 2020 to file a complaint in court. Ingram timely initiates the present lawsuit.

## CAUSES OF ACTION

## COUNT I

## DISABILITY DISCRIMINATION, IN VIOLATION OF THE ADA

45. Ingram is disabled within the meaning of the ADA.

46. Ingram is a qualified individual within the meaning of the ADA.

47. Section 12112(a) of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

48. Union Pacific discriminated against Ingram on the basis of disability when it issued him work restrictions, removed him from his job, and refused to allow him to return to it.

49. Because Union Pacific violated 42 U.S.C. § 12112, Ingram has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Ingram is also entitled to attorneys' fees and costs incurred in connection with these claims.

50. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for Ingram's rights and safety. As a result, Ingram is entitled to punitive damages.

## COUNT II

## UNLAWFUL SCREENING, IN VIOLATION OF THE ADA

51. Ingram is disabled within the meaning of the ADA.

52. Ingram is a qualified individual within the meaning of the ADA.

53. Section 12112(a) of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

54. Section 12112(b)(6) of the ADA defines "discriminat[ing] against a qualified individual on the basis of disability" as including "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]"

55. Union Pacific discriminated against Ingram on the basis of disability by imposing selection criteria, including medical screening, that screens out, tends to screen out, or has a disparate impact on individuals who disclose disabilities.

56. Because Union Pacific violated 42 U.S.C. § 12112, Ingram has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Ingram is also entitled to attorneys' fees and costs incurred in connection with these claims.

-11-
COMPLAINT FOR DAMAGES

57. Union Pacific committed the above-alleged acts with reckless disregard or deliberate disregard for Ingram's rights and safety. As a result, Ingram is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ingram prays for judgment against Union Pacific as follows:

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Ingram's costs, disbursements and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

## PRAYER FOR RELIEF

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: August 17, 2020        **NICHOLS KASTER, LLP**

By:   s/ Matthew C. Helland
        Matthew C. Helland

Attorney for Plaintiff